IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MARIE DIFIORE,** | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | No. 13-05027 |
| v. | : | |
| | : | |
| **CSL BEHRING, U.S., LLC** and | : | |
| **CSL BEHRING, LLC,** | : | |
| Defendants. | : | |

**MEMORANDUM**

McHugh, J.                                                                                          September 17, 2014

    This is an employment action brought by a former employee of a pharmaceutical company, who alleges she was forced out of her job for acting as a whistleblower. The question before me is whether plaintiff's claims under Pennsylvania common law are viable.

    Defendant CSL Behring is a pharmaceutical company that produces and markets plasma protein biotherapeutics. Plaintiff Marie Difiore was hired by the Defendant, CSL Behring, in 2008 as an Associate Director of Marketing. She was later promoted to Director of Marketing. Ms. Difiore's duties as both Associate Director of Marketing and Director of Marketing involved the commercialization and launch of three pharmaceutical products: RiaSTAP, Beriplex, and Corifact.

    RiaSTAP is used to treat acute bleeding episodes in patients with congenital fibrinogen deficiency. Beriplex is designed to allow rapid reversal of the effects of vitamin K antagonists, which is often required in cases of emergency surgery and life-threatening bleeding. Corifact was approved by the FDA for treatment of a congenital condition known as Factor XIII Deficiency.

    Ms. Difiore alleges that CSL Behring had planned to market and encourage "off-label," unapproved use of RiaSTAP. Compl. ¶ 20. She cites a marketing presentation for which Senior

1

Director of Marketing Janice Cannizzo insisted she use a template that included market share penetration for off-label procedures. ¶ 22. According to Plaintiff, revenue from off-label procedures was included by CSL Behring in evaluating return on investment. ¶ 22. Ms. Difiore also alleges that the revenue from off-label procedures was used in sales/manufacturing reports and forecasts, ¶¶ 23–25, and that she objected and requested to be absolved from these activities. ¶ 25.

Ms. Difiore alleges that Dr. Ingolf Sieper was promoted to lead Global Commercial Operations, and, shortly thereafter, CSL Behring began to push RiaSTAP for acquired bleeding—an unauthorized use of the drug. ¶¶ 26–29. Ms. Difiore claims to have opposed this practice, but was ignored. ¶ 30. She further claims that the company made clear that she was expected to support the marketing of RiaSTAP for the unapproved use of acquired bleeding, despite her strong objections. ¶¶ 32–36.

CSL Behring partnered with Rotem, a manufacturer of lab instruments designed to diagnose coagulation irregularities. According to Plaintiff, when a Rotem instrument revealed a deficiency, Rotem sales personnel would suggest an off-label use of RiaSTAP to address it. ¶ 38. Ms. Difiore alleges that CSL Behring made strong collaborative efforts with Rotem, including the sharing of business plans and training of Rotem sales personnel. ¶¶ 39–42. Ms. Difiore further alleges that her objections to meetings dealing with off-label use of the drug led to criticism from her superiors and rescinded invitations from certain meetings. ¶¶ 44–46. She also notes numerous other occasions where she objected to these practices.

Plaintiff goes on to allege that these inappropriate promotional practices extended to the drug Beriplex as well. ¶ 54. She contends that senior management made a decision in a meeting to delay reporting of two adverse events associated with the Beriplex phase III testing. ¶ 59. The decision was ultimately reversed, but Ms. Difiore claims it is documented in a PowerPoint presentation. ¶¶ 61–62.

Ms. Difiore asserts additional unethical and illegal conduct to which she objected. She states that she reviewed a draft of a research and development presentation to be presented to potential investors. ¶ 68. The report contained misleading information that prompted Ms. Difiore to raise complaints for which she was chastised. ¶¶ 69–72. She further alleges that CSL Behring has sought to mislead investors with regard to the Beriplex reporting. ¶ 73. In 2011, CSL Behring had several antitrust lawsuits pending that alleged the company had conspired to restrict the output of blood plasma to artificially control the process of plasma derived protein therapies. ¶ 74. Ms. Difiore had attended a conference in Brussels as U.S. CSL Plasma Protein Therapeutics Association representative. ¶ 74. She contends that, while at dinner, she had to excuse herself several times to avoid an inappropriate conversation in which Albert Farragia, Vice President of Plasma Protein Therapeutics Association, began to disclose information to George Henckle, Director of Commercial Development/Critical Care. ¶¶ 75–76. When Ms. Difiore reported the matter to Ms. Cannizzo, no further action was taken with regard to the matter. ¶ 77.

In December 2011, the company initiated an audit process during which Ms. Difiore alleges she shared her concerns with the auditors. ¶ 63. She claims that efforts to retaliate against her increased significantly after this. ¶ 65. Additionally, she states that she began to consistently raise her concerns in writing at the end of 2011. ¶ 79. As a result, she alleges management constructively terminated her by berating her, citing her for poor performance, and creating unobtainable performance objectives. Ms. Difiore claims that the workplace became hostile and abusive, causing her negative health effects and ultimately forcing her to leave her employment.

Defendant CSL Behring now seeks to dismiss Count II of the complaint, a common law claim for wrongful termination, and correspondingly strike the Plaintiff's prayer for punitive damages. Two issues are presented: (1) whether the state law wrongful termination claim is pre-

empted as a matter of law, and (2) whether plaintiff has adequately pled her wrongful termination claim.

I.      Preemption of Wrongful Termination Claim

Plaintiff raises a federal claim under the anti-retaliation provision of the False Claims Act (FCA), 31 U.S.C. § 3730(h), which provides for a variety of remedies, including damages. 31 U.S.C. § 3730(h)(2). Plaintiff also asserts a claim for wrongful discharge under Pennsylvania common law. In Pennsylvania, common law claims for wrongful discharge are only available where "there is no statutory remedy for the alleged retaliatory discharge." United States *ex rel.* Budike v. PECO Energy, 897 F. Supp. 2d 300, 326 (E.D. Pa. 2012); McAlee v. Independence Blue Cross, 798 F. Supp. 2d 601, 604 (E.D. Pa. 2011) (finding that remedies available under the Uniformed Services Employment and Reemployment Rights Act (USERRA) preempt a Pennsylvania wrongful discharge claim); DeMuro v. Philadelphia Housing Authority, CIV. A. 98-3137, 1998 WL 962103 (E.D. Pa. Dec. 22, 1998) (finding a Pennsylvania wrongful discharge claim preempted by the Pennsylvania Whistleblower statute for the same reason).

Where the facts underlying the wrongful discharge claim are identical to the facts underlying the FCA retaliation claim, the wrongful discharge claim will typically be preempted. See Budike, 897 F. Supp. 2d at 327. In contrast, if the underlying facts are "completely independent and unrelated" to the allegations that fall within the statutory remedy, no pre-emption exists. See, e.g., Katzenmoyer v. City of Reading, Pa., 158 F. Supp. 2d 491, 504–05 (E.D. Pa. 2001).

CSL argues here that there is no distinction between the facts alleged in support of Ms. Difiore's federal statutory claim and those supporting her claim under Pennsylvania common law. Defendant relies heavily upon language within Count II of the Complaint dealing with wrongful

4

termination. Compl. ¶¶ 111–15. While ¶ 113 mentions the off-label promotions that fall within the FCA and ¶ 114 mentions false claims also within the FCA, ¶ 112 mentions only unethical and illegal activity in violation of Pennsylvania public policy. Additionally, the Plaintiff makes numerous factual allegations regarding activities that may not fall under the FCA, and are independent from the off-label promotion alleged. See Pl. Sur-Reply Br. 2. Based on these pleadings, it does not appear as though the FCA statutory claim should be held to preclude the common law wrongful discharge claim, at least at this point. CSL Behring can revisit this issue through summary judgment should discovery not establish the existence of distinct claims.

    II.        Validity of Wrongful Termination Claim as a Matter of Law

Traditionally in Pennsylvania, "there is no common law cause of action against an employer for termination of an at-will employment relationship." Weaver v. Harpster, 601 Pa. 488, 500, 975 A.2d 555, 562 (2009). There is an exception to this rule when "discharges of at-will employees would threaten clear mandates of public policy." Id. at 501, 975 A.2d at 563.  Public policy in Pennsylvania is determined "by examining the precedent within Pennsylvania, looking to [the Pennsylvania] Constitution, court decisions and statutes promulgated by [the Pennsylvania] legislature." McLaughlin v. Gastrointestinal Specialists, Inc., 561 Pa. 307, 316, 750 A.2d 283, 288 (2000). To prevail, a plaintiff must show more than a possible violation of a federal statute. Id. at 317, 750 A.2d at 289. Rather, a plaintiff must show that a policy of the Commonwealth of Pennsylvania is "implicated, undermined, or violated" by the employee's termination. Id., 750 A.2d at 289.

There appear to be three limited circumstances in which public policy will trump employment at-will. "[A]n employer (1) cannot require an employee to commit a crime [and fire the employee for refusing to do so], (2) cannot prevent an employee from complying with a statutorily

5

imposed duty, and (3) cannot discharge an employee when specifically prohibited from doing so by statute." Fraser v. Nationwide Mut. Ins. Co., 352 F.3d 107, 111 (3d Cir. 2003) (quoting Hennessy v. Santiago, 708 A.2d 1269, 1273 (Pa. Super. 1998)); Mikhail v. Pennsylvania Organization for Women in Early Recovery, 63 A.3d 313, 317 (Pa. Super. 2013); Moyer v. Kaplan Higher Educ. Corp., 413 F. Supp. 2d 522, 528 (E.D. Pa. 2006); Diberardinis-Mason v. Super Fresh, 94 F. Supp. 2d 626, 629 (E.D. Pa. 2000). As recognized by the Third Circuit in Fraser, the critical case is Shick v. Shirey, 552 Pa. 590, 559–600, 716 A.2d 1231, 1235 (1998), where the Supreme Court held that "'public policy' is not limited to 'that which has been legislatively enacted.'" Fraser, 352 F.3d at 111–12. Or, as the rule was formulated by the Pennsylvania Superior Court, "[o]utside of those categories of [the Pennsylvania] legislature's expression of public policy, a court may find a public policy 'is so obviously for or against public health, safety, morals, or welfare that there is a virtual unanimity of opinion in regard to it.'" Mikhail, 63 A.3d at 317 (quoting Weaver, 601 Pa. at 502, 975 A.2d at 563).

      I am persuaded that Ms. Difiore has alleged more than violation of the False Claims Act. The Pennsylvania Superior Court has held that a violation of public policy can occur when an employer requires an employee to commit a crime. See Hennessy, 708 A.2d at 1273; Mikhail, 63 A.3d at 317. Plaintiff has pleaded that her termination resulted from her "refusal to engage in unethical and illegal activity," Compl. ¶¶ 111–12, and some of the conduct alleged could qualify as a violation of 18 Pa. Cons. Stat. § 4107, even though Plaintiff did not specifically cite that statute in her complaint.

      CSL also argues that internal reports to an employer are insufficient to state a claim for wrongful discharge, absent evidence that such a report would undermine the workings of a Pennsylvania agency, or some statutory mechanism. That argument is inapplicable under the circumstances of this case. Plaintiff is not alleging that she was fired because of internal reports or

6

complaints she made, but rather for "her refusal to engage in unethical and illegal activity." Compl. ¶¶ 111–12. McLaughlin, the case upon which CSL relies, does not stand for the proposition that a plaintiff must always file a complaint with a Commonwealth agency in order to maintain a valid claim for wrongful discharge. Rather, McLaughlin reiterates the point made in Shick: that a firing in retaliation for a complaint made to a Commonwealth agency would constitute a violation of Pennsylvania public policy. 561 Pa. at 316–17, 750 A.2d at 288–89. It does not make such an administrative complaint mandatory where a plaintiff can point to a Pennsylvania "statute, constitutional premise, or decision" that is undermined by her termination. Id. at 316, 750 A.2d at 288.

### III.   Availability of Punitive Damages

Viewed against the allegations in the complaint, dismissal of punitive damages claims at this juncture is premature. Punitive damages have been awarded in wrongful discharge claims in Pennsylvania. See, e.g., Rue v. K-Mart Corp., 691 A.2d 498 (Pa. Super. 1997); McGonagle v. Union Fidelity Corp., 556 A.2d 878 (Pa. Super. 1989). Plaintiff has the right to develop her case through discovery before the court rules on the propriety of a punitive damages claim.

       /s/ Gerald Austin McHugh
United States District Court Judge