IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MARIE DIFIORE, | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | No. 13-5027 |
| | : | |
| CSL BEHRING, U.S., LLC and | : | |
| CSL BEHRING, LLC, | : | |
| Respondents. | : | |

MCHUGH, J.                                                                                                                  MARCH 17, 2016

**MEMORANDUM**

      This case concerns the protections available to a pharmaceutical company employee who raises concerns about off-label marketing of drugs. This Court previously denied a Motion to Dismiss Plaintiff's state law Wrongful Discharge claim, but I now consider Defendant CSL Behring, LLC's Motion for Summary Judgment in light of the record presented by the parties. I find that Plaintiff has failed to make a showing sufficient to establish that she was constructively discharged, so Defendant's Motion must be granted as to the Wrongful Discharge claim; however, because I find that the record presents material issues of fact regarding Plaintiff's claims under the False Claims Act, Defendant's Motion will be denied as to that claim.

**I.    Facts**

      Defendant CSL Behring, LLC is a pharmaceutical company that produces and markets plasma protein biotherapeutics.[1] Plaintiff Marie Difiore began working for CSL in April 2008 as an Associate Director of Marketing. Hiring Letter, Def. Ex. D. About four months after the start

---

[1] Defendant CSL Behring, LLC points out that Plaintiff has also named another entity as a defendant, CSL Behring, U.S., LLC, but it states that no such entity exists. Def.'s Mem. Supp. Mot. Summ. J. at 17. Since Plaintiff concedes that she has no evidence to the contrary, she informed the Court that she is not opposed to the dismissal of CSL Behring, U.S., LLC. Pl.'s Resp. Def.'s SUF. CSL Behring, U.S., LLC is therefore dismissed, and all references to "Defendant" and "CSL" contained herein will refer to CSL Behring, LLC.

1

of her employment, she raised a complaint to her supervisor, Janice Cannizzo, regarding a sales forecast that was to be presented to investors. The sales forecast concerned a drug called RiaSTAP that had, at that point, only been approved by the Federal Drug Administration for an indication to treat congenital coagulation deficiencies. DiFiore Dep., Pl. Ex. C at 9–12. Plaintiff expressed concern that the sales forecast took into account potential sales of the drug for other, non-approved indications, like acquired bleeding. *Id.* at 11. Cannizzo brought Plaintiff's concern to CSL's compliance department, and members of that department met with Plaintiff and Cannizzo to discuss the concerns. *Id.* at 27–30. CSL understood Plaintiff's complaint to be that she anticipated that if CSL did not get FDA approval for those other indications, then the value of the drug as stated in the sales forecast would be overinflated and she would be pressured to engage in off-label marketing in order to reach that volume of sales. Morris Dep., PL. Ex. K at 53–54; Neff 30(b)(6) Dep., Pl. Ex. O at 19–22. The Senior Chief Compliance Officer, John Neff, testified that Plaintiff appeared comfortable with the short-term projections after the meeting, and he encouraged her to follow up with him if she had concerns later. Neff. Dep., Pl. Ex. P at 11.

DiFiore was promoted to Director of Marketing on August 1, 2011. Promotion Letter, Def. Ex. F. Just after her promotion, in the fall of 2011, Plaintiff cites several incidents that caused her concern. First, CSL hired Dr. Ingolf Sieper, who had previously worked in European markets, to build CSL's market for acquired bleeding drugs in the United States. Plaintiff reports that the then-Senior Vice President of North America Commercial Operations, Lynne Powell told her during a meeting with Sieper "we have to put our best foot forward, we have to seem receptive, you know, especially to any off[-]label tactics he wants to implement. We cannot appear … resistant." DiFiore Dep., Pl. Ex. C at 32:16–21. Plaintiff says she told Powell

2

after the meeting that the comment made her uncomfortable. *Id.* at 32–33. CSL reports that Sieper later received compliance training after other employees later raised complaints about another incident in which Sieper made comments regarding off-label use of a product. Hendri 30(b)(6) Dep., Pl. Ex. N at 22–23.

Plaintiff was also asked to develop a relationship with the manufacturers of an instrument called Rotem, which is used to test for a certain blood protein. RiaSTAP was not approved in the U.S. to treat the acquired bleeding disorders for which this test would be relevant, but Cannizzo testified that this relationship was to be formed in anticipation of getting a broader approved indication in the future. Cannizzo Dep., Pl. Ex. R at 74–75. Plaintiff expressed concerns that this relationship would result in off-label use of their products. DiFiore Dep., Pl. Ex. C at 34–36.

In another instance, Plaintiff was included on an email thread discussing a fine levied against a competitor for off-label marketing. When one employee speculated that the competitor likely made enough profits from the off-label sales to cover the cost of "at least 10-fold the fine," Plaintiff responded to the email by stating that this was not an appropriate model to use, and "the only approach [she] can support" is to seek a broad approval from the FDA so that they can promote the product for on-label indications. Novo Nordisk Email, Pl. Ex. T.

At a trade meeting for the Plasma Protein Therapeutics Association (PPTA), Plaintiff heard a PPTA official approach a CSL employee and begin an inappropriate discussion regarding another manufacturer's business plans. Plaintiff reported the conversation to Cannizzo later, but CSL says they investigated and found that nothing unlawful took place. Neff 30(b)(6) Dep., Pl. Ex. O at 39–43.

In December 2011, a team of consultants came in to do a compliance audit. Cannizzo testified that the audit was ordered at the request of members of the medical team in order to

3

establish clearer policies and procedures, Cannizzo Dep., Pl. Ex. R at 78, but Plaintiff says she was told it was the result of complaints from her and others. DiFiore Dep., Pl. Ex. C at 46. Plaintiff also testified that Cannizzo told her, "share what … you believe to be truthful but less is more." *Id.* at 103. Plaintiff testified, however, that she shared her concerns with the audit team. *Id.* at 102–103.

In the next two months, CSL took a series of disciplinary actions against Plaintiff. First, Plaintiff's new role as Director of Marketing required her to lead the launch of a new drug called Beriplex, and around December 2011, CSL decided to form the "Beriplex Core Launch Team" (BCLT) with Plaintiff as the leader. Cannizzo Dep., P. Ex. R at 43. On December 17, 2011, Plaintiff spoke on the phone with one of the members of the team from the medical department, William Allan Alexander. Plaintiff claims Alexander spoke to her in an unprofessional manner and hung up on her. DiFiore Dep., Pl. Ex. C at 246. Plaintiff complained to Cannizzo about it the next day. *Id.* at 245–46; D's Ex. P. Shortly thereafter, Plaintiff and Alexander got in another heated discussion during a BCLT meeting; Cannizzo was present and called for a break, but Plaintiff did not take one right away. *Id.* at 247–48. Cannizzo and another manager met with Plaintiff after the meeting and "scolded" her. *Id.* at 248. Cannizzo testified that she was concerned that Plaintiff's struggle to communicate and coordinate between the medical and marketing teams was having an adverse impact on the launch of Beriplex. Cannizzo Dep., Pl. Ex. R at 88–89. Trina Hendri, CSL's Human Resources Director, investigated the circumstances of the phone call and BCLT meeting and issued both DiFiore and Alexander warning letters in January 2012. January Warning Letter, Def. Ex. W; Alexander Warning Letter, Def. Ex. X.

Next, on February 1, 2012, Cannizzo conducted a mid-year performance review and ranked Plaintiff as needing improvement in several areas, particularly in team leadership. Mid-

4

Year Review, Def. Ex. EE.  Plaintiff wrote a letter as an addendum to this review, pointing out that she thought the harsh criticism was a result of her complaints about Alexander and her statements to the auditors regarding compliance issues with RiaSTAP.  Pl. Addendum to Mid-Year Review, Pl. Ex. W.  On February 6, CSL retained an employment coach to work with Plaintiff and the BCLT, at the cost of $45,000 in consultancy fees.  Statement of Work, Def. Ex. Y.

Finally, on February 28, 2012, Plaintiff was issued a warning letter regarding her use of a company credit card.  The letter pointed out that Plaintiff's card had been cancelled by the credit card company because her account was more than 180 days past due, and she would not be issued a new card.  February Warning Letter, Def. Ex. M.  Plaintiff noted that the warning letter was "appropriate," but she viewed it as a disproportionate response.  DiFiore Dep., Pl. Ex. C at 174–77.[2]

Plaintiff also describes how her relationship with her supervisors declined during this time.  She says Cannizzo became hostile towards her and began documenting all of Plaintiff's activities, which she attributes to Cannizzo's desire to establish credibility with Sieper.  *Id.* at 85, 122–23.  She says Cannizzo told her that she was too "black and white," and as a director, she needed to "understand shades of gray."  *Id.* at 104:8–16.  She says Powell "completely avoided" her and "ostracized" her, to the point that Powell refused to make eye contact with her in the hallway.  *Id.* at 85–86.  She also testified that other supervisors criticized her in the meetings that she was meant to be leading.  *Id.* at 86.

---

[2] Although the parties do not mention this fact in their filings, the record shows that when Plaintiff was confronted by a supervisor from CSL's card services department in January 2012 regarding the overdue balance, she apologized and explained that she had been acting as a full-time caregiver for a terminally ill family member for the past several months.  Plaintiff admitted that "things fell through the cracks," but because the family member passed away, things were "back on track."  Def. Ex. L.

5

Plaintiff then raised two additional complaints in the spring of 2012.  In February 2012, CSL was working on a biologic license application to submit to the FDA related to Beriplex.  *Id.* at 53–56.  A hospital conducting clinical trials notified CSL that they had underreported some adverse events.  CSL was up against a deadline, so they had to make the decision whether to submit the current study report and then supplement it later with information about the additional adverse events, or whether to delay the report in order to include the information.  *Id.* at 54–55.  Plaintiff opposed the idea of submitting the report without the adverse events, and she voiced her opposition to several of her supervisors.  *Id.* at 56–57.  Plaintiff testified that she told Cannizzo that "this kind of behavior is going to force someone to go to the FDA," and she said that Cannizzo told her that " '[a]nybody that would go to the FDA will never work in this industry again.'"  *Id.* at 322:19–323:2.  CSL ultimately decided to take the approach advocated by Plaintiff and wait to submit a report with the additional information.  Neff 30(b)(6) Dep., Pl. Ex. O at 31–32.  In addition, around this same time, Plaintiff again raised concerns that the sales forecast she was provided for Beriplex was accounting for off-label use of the drug.  DiFiore Dep., Pl. Ex. C at 73–80.

At Plaintiff's request, Cannizzo relieved her of her sales forecasting duties.  *Id.* at 83–84.  In April, Lynne Powell removed Plaintiff from the Blood Products Advisory Committee.  Hirsch Email, Pl. Ex. JJ.  Finally, on May 7, 2012, Cannizzo and Hendri informed Plaintiff that she was being put on a Performance Improvement Plan (PIP).  The PIP extended Plaintiff's employment coach for an additional 45 days, and warned her that if she did not show improvement in certain areas within 45 days, she would be subject to discipline and possibly termination.  PIP, Def. Ex. HH at 6–7.  These areas included: effectively leading the BCLT; improving communications and follow-up; developing effective plans; asking questions when unclear about assignments;

submitting assignments timely; avoiding intrusion into others' areas of responsibility; and demonstrating an ability to "navigate the organizational dynamics."  PIP, Def. Ex. HH at 6. Plaintiff made efforts to meet with Cannizzo and Hendri to discuss an "amicable separation." DiFiore Dep., Pl. Ex. C at 191; Hendri Dep., Def. Ex. V at 65–66.  However, after a meeting scheduled for such a discussion on May 11 was cancelled, Plaintiff submitted her resignation letter on May 14, 2012.  Resignation Letter, Def. Ex. HH.  Plaintiff filed the instant lawsuit on August 27, 2013, alleging Wrongful Termination under Pennsylvania state law and violation of the False Claims Act ("FCA"), 31 U.S.C. § 3730(h).  Compl. at ¶ 17.

## II.     Summary Judgment Standard

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  A fact is material if it "might affect the outcome of the suit under the governing law," and a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "Factual disputes that are irrelevant or unnecessary will not be counted."  *Id.*

The party moving for summary judgment has the initial burden of identifying the portions of the record that demonstrate an absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant need not "support its motion with affidavits or other similar materials negating the opponent's claim."  *Id.* at 323.  It can meet its burden simply by "pointing out ... that there is an absence of evidence to support the nonmoving party's claims." *Id.* at 325.

"The non-moving party must then "rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *Berckeley Inv. Group. Ltd. v. Colkitt,* 455 F.3d 195, 201 (3d Cir.2006).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Anderson*, 477 U.S. at 252; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (stating that the opponent of summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts.").  If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate.  *Celotex,* 477 U.S. at 322.

While it is not the court's role to make credibility determinations or weigh the evidence, the court must assess "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 251–52.

### III.     Wrongful Discharge Claim

Defendant first challenges Plaintiff's state law wrongful discharge claim.  As discussed in this Court's previous Order ruling on Defendant's Motion to Dismiss, there is a Pennsylvania state tort law cause of action for wrongful discharge where discharge of an at-will employee would threaten a clear mandate of public policy.  Court's September 17, 2014 Order at 3–4 (citing *Weaver v. Harpster,* 975 A.2d 555, 562 (Pa. 2009)).

> There appear to be three limited circumstances in which public policy will trump employment at-will.  "[A]n employer (1) cannot require an employee to commit a crime [and fire the employee for refusing to do so], (2) cannot prevent an employee from complying with a statutorily imposed duty, and (3) cannot discharge an employee when specifically prohibited from doing so by statute."

8

> *Fraser v. Nationwide Mut. Ins. Co.,* 352 F.3d 107, 111 (3d Cir. 2003) (quoting *Hennessy v. Santiago,* 708 A.2d 1269, 1273 (Pa. Super. Ct. 1998)).

*Id.*; s*ee also Field v. Phil. Elec. Co.*, 565 A.2d 1170 (Pa. 1989) (against public policy to terminate an employee in retaliation for reporting safety violations to the Nuclear Regulatory Commission, as the law required); *Reuther v. Fowler & Williams, Inc.*, 386 A.2d 119 (Pa. Super. Ct. 1978) (against public policy to terminate an employee for serving on jury); *Shick v. Shirey*, 716 A.2d 1231, 1237 (Pa. 1998) (against public policy to terminate an employee for filing a workers' compensation claim).  Plaintiff argues that she was discharged for refusing to engage in "illegal off-label marketing, defrauding investors, and defrauding the FDA" in violation of 18 Pa. Cons. Stat. § 4107.  Pl.'s Mem. Opp. Mot. Summ. J. at 27.

A. *Constructive Discharge*

Defendant first argues that it is entitled to summary judgment on this claim because Plaintiff cannot meet her burden to prove that she was constructively discharged from her employment.  Def. Mem. Supp. Mot. Summ. J. at 5.  While tort recovery for a claim of wrongful discharge necessarily requires that the plaintiff be discharged, a constructive discharge will suffice.  *Kroen v. Bedway Sec. Agency, Inc.*, 633 A.2d 628, 633–34 (Pa. Super. Ct. 1993) ("[W]e do not believe that an employer should be shielded from liability simply because he has not uttered the words, 'You are fired.' ").

Although Plaintiff argues that the Third Circuit's test for constructive discharge presented in *Clowes v. Allegheny Valley Hosp.*, 991 F. 2d 1159 (3d Cir. 1993) applies, Pennsylvania courts have specified that in this particular context—a tort claim for wrongful discharge in violation of public policy—courts should "employ the definition of 'constructive discharge' as applied in cases litigated pursuant to the Pennsylvania Labor Relations Act, 43 Pa.C.S.A. § 211.1 *et seq.*" *Kroen*, 633 A.2d at 634 (citing *Pennsylvania Labor Relations Board v. Sand's Restaurant,* 240

9

A.2d 801, 803 (Pa. 1968)).  That definition provides that liability will be imposed "for 'constructive discharge' of an at-will employee where the employer makes working conditions so intolerable that the employee is forced to resign."  *Kroen*, 633 A.2d at 633–34 (citing *National Labor Relations Board v. Saxe-Glassman Shoe Corp.,* 201 F.2d 238 (1st Cir. 1953); *National Labor Relations Board v. Chicago Apparatus Corp.,* 116 F.2d 753 (7th Cir. 1940); *Pennsylvania Labor Relations Board v. Sand's Restaurant,* 240 A.2d 801, 803 (Pa. 1968)) (internal quotations omitted).  The "intolerability" of working conditions is assessed by an objective standard of whether a reasonable employee would feel he had no choice but to resign.  *Helpin v. Trustees of Univ. of Pennsylvania*, 969 A.2d 601, 614 (Pa. Super. Ct. 2009), *aff'd*, 10 A.3d 267 (Pa. 2010) (citation omitted).  "It may not be premised upon the conclusion that resignation was the wisest or best decision under the circumstances, nor is it established based on an employee's subjective judgment."  *Id.*

Other Pennsylvania wrongful discharge cases are illustrative.  In *Kroen*, almost immediately upon refusing to undergo a polygraph examination, the plaintiff was demoted and his hours and pay were cut so that he experienced a nearly 71% reduction in weekly wages; the court considered his subsequent resignation to be a constructive discharge.  633 A.2d at 634.  In *Highhouse*, the plaintiff's employer withheld a Christmas bonus and told him that he would only be given assignments in a "dire emergency."  *Highhouse v. Avery Transp.*, 660 A. 2d 1374, 1376 (Pa. Super. Ct. 1995).  The employee's subsequent decision not to undergo a drug test, which was required to be eligible for work but would be at his own expense, was a constructive discharge rather than a voluntary resignation.  *Id.*  In contrast, one of the plaintiffs in *Sand's* was informed by a coworker that she was going to be fired for her union activities, and when her manager arrived, she asked for her pay and left.  *Pennsylvania Labor Relations Bd. v. Sand's*

10

*Rest. Corp.*, 240 A.2d 801, 804 (Pa. 1968). Because nothing in the record demonstrated that the manager knew about the coworker's statement, the court held that the plaintiff was not constructively discharged merely because she acted in anticipation of what she believed was the employer's contemplated action. *Id.*

In this case, Plaintiff can cite to no change in her pay, title, or essential job responsibilities. On the contrary, CSL expended a significant amount of money to engage a coach for Plaintiff, and they even extended the contract for this coach through the PIP probationary period. Plaintiff was relieved of her forecasting responsibilities, but she testified that she had been requesting that change for months; that can hardly be said to be a demotion. Plaintiff has produced some evidence that her relationships with several managers began to suffer after she reported her concerns, but nothing in the record reflects that this rose to the level of a hostile work environment that would make a reasonable employee think she had *no choice* but to resign.

Plaintiff points to the Performance Improvement Plan as the impetus for her resignation, arguing it was "reasonable for her to believe she would be fired," and "CSL knew or should have known" that placing her on a PIP would lead her to resign. Mem. Opp. Mot. Summ. J. at 17. However, merely acting in anticipation of what she believed to be CSL's intended course of action is not sufficient to establish constructive discharge. *See Sand's*, 240 A.2d at 804. While many people who were put on a PIP either resigned or were terminated, the evidence also shows that others successfully completed the probationary period. Moreover, the threat of termination in the letter was presented as a possible action conditioned on an event that might never happen—a need for progressive discipline. *See Seeney v. Elwyn, Inc.*, 409 F. App'x 570, 574 (3d Cir. 2011). "[A]n inference based upon a speculation or conjecture does not create a material

11

factual dispute sufficient to defeat entry of summary judgment." *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d Cir. 1990). Certainly an employee may decide that the prospect of resigning is preferable to being fired outright, but neither wounded pride nor apprehension is the same as termination.

To the extent that I accept Plaintiff's argument that *Clowes* is relevant in determining what constitutes a constructive discharge, I find that *Clowes* actually contradicts Plaintiff's position. In *Clowes*, the plaintiff was a nurse who claims that her supervisor singled her out for "especially close and harsh supervision." 991 F.2d at 1160. Clowes asserted that the supervisor checked over her work to seek out mistakes, wrote down everything she did or said, spoke to her in a critical and condescending manner in front of other nurses, and rated her as "fair" in written evaluations even though she had only received ratings of at least "good" in the past. *Id.* Eventually Clowes left the position after she was put on an improvement plan where she was required to submit a list of written goals, informed that her performance would be reviewed periodically, and told that "disciplinary action would be taken if she did not improve." *Id.* The Third Circuit went so far as to overturn the jury's finding that her subsequent resignation constituted constructive discharge, cautioning that a claim of constructive discharge based solely on evidence of close supervision of job performance must be critically examined so that anti-retaliation statutes are not "improperly used as a means of thwarting an employer's nondiscriminatory efforts to insist on high standards." *Id.* at 1162.

The facts in *Clowes* closely mirror the record of the present case. Viewing the evidence in the light most favorable to Plaintiff, it appears that Cannizzo may have unfairly singled her out for especially close supervision. Cannizzo undermined Plaintiff's authority in front of other employees, was quick to issue written warnings for infractions, gave her uncharacteristically

negative performance reviews, and warned Plaintiff that she may be terminated if she didn't meet a list of subjective requirements listed in the PIP. However, "it is clear that unfair and unwarranted treatment is by no means the same as constructive discharge." *Id.* at 1162. The record evidence does not rise to the level that would permit a reasonable jury to find that Plaintiff's working conditions were so *intolerable* that she was *forced* to resign. Therefore, Defendant is entitled to summary judgment on Plaintiff's wrongful discharge claim.[3]

B. *Violations of Public Policy*

Even if Plaintiff were constructively discharged, I am skeptical that she had produced sufficient evidence to prove that her discharge was the result of her refusal to commit a crime. She vaguely argues that "there were many things that she was being requested to take part in … that she believed to be illegal," and she "repeatedly and expressly indicated her belief that she was under continuing pressure to engage in illegal activities." Pl.'s Mem. Opp. Mot. Summ. J. at 26. The specific "illegal activities" that Plaintiff cites include: "illegal off-label marketing, defrauding investors, and defrauding the FDA." Pl.'s Mem. Opp. Mot. Summ. J. at 27. As suggested by this Court in its previous Order, Plaintiff argues that these practices are made unlawful by Pa. Cons. Stat. § 4107. Pl.'s Mem. Opp. Mot. Summ. J. at 27. However, she does not cite which of the eleven sub-sections of that statute apply to her case, nor does she cite any case law to illustrate the application of that statute to these facts.

---

[3] Plaintiff's citation to other persuasive authority from Title VII and ADEA cases does not change my analysis. *McCall v. Butler Health Systems*, No. 13-130, 2013 WL 6253417 (W.D. Pa. Dec. 4, 2013) and *Boandl v. Geithner*, 752 F. Supp. 2d 540 (E.D. Pa. 2010) were each cases where an employee was actively encouraged to retire; in *Matos v. PNC Fin. Servs. Group*, No. 03-5320, 2005 WL 2656675 (D.N.J. 2005), the plaintiff was faced with an ultimatum of either going to a religious convention or being fired; and in *Shafer v. Bd. of Public. Educ.*, 903 F.2d 243 (3d Cir. 1990), the plaintiff gave her employer an ultimatum that she would resign if her request were not granted. Plaintiff in this case merely argues that her employer should have been aware that she would be inclined to resign if put on a PIP, so it is likely they put her on the PIP for that reason. That level of speculation is insufficient to meet her burden for summary judgment.

The Third Circuit, applying Pennsylvania law, has stated that an employee's own reasonable but erroneous belief that his employer has requested he perform an unlawful act is not sufficient to state a claim for wrongful discharge. *Clark v. Modern Grp. Ltd.*, 9 F.3d 321, 323 (3d Cir. 1993). In addition, "Pennsylvania courts 'have repeatedly rejected claims that a private employer [as opposed to a public employer] violated public policy by firing an employee for whistleblowing, when the employee was under no legal duty to report the acts at issue.' " *Fraser v. Nationwide Mut. Ins. Co.*, 352 F.3d 107, 112 (3d Cir. 2003), *as amended* (Jan. 20, 2004) (citing *Donahue v. Fed. Express Corp.,* 753 A.2d 238, 244 (Pa.Super.2000) (collecting cases)). Plaintiff has not produced in the record any of the sales forecasts she claims were unlawful, and her response to the Motion for Summary Judgment fails to prove anything beyond her own "belief" that CSL's activities were illegal. Referencing a relevant criminal statute is insufficient to meet her burden of proving that CSL's actions violate Pennsylvania public policy.

## IV. FCA Claim

Defendant next argues that it is entitled to summary judgment on Plaintiff's FCA claim because Plaintiff has not established that she suffered an adverse employment action.

The FCA anti-retaliation provision provides that an employee is entitled to relief if she is "discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment" because of her efforts to stop FCA violations. 31 U.S.C. § 3730(h)(1). Plaintiff has the burden of proving that "she was engaged in 'protected conduct,' that as a result she was subject to adverse employment action, and that there is a causal nexus between Plaintiff's actions and Defendant's alleged … retaliatory behavior." *United States v. Univ. of Med.*, No. 03-4837, 2010 WL 4116966, at *8 (D.N.J. Oct. 18, 2010) *aff'd sub nom. U.S. ex rel. Hill v. Univ. of Med. & Dentistry of New Jersey*, 448 Fed. App'x 314

(3d Cir. 2011) (citing *Woodson v. Scott Paper Co.,* 109 F.3d 913, 920 (3d Cir. 1997).[4]  The required causal link can be inferred from temporal proximity, a pattern of antagonism following the protected conduct, or an examination of the proffered circumstantial evidence as a whole. *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 177 (3d Cir. 1997).

The parties do not dispute whether the FCA applies, whether Plaintiff was engaging in protected conduct, or whether Defendant knew Plaintiff was engaging in protected conduct when it acted; Defendant only argues that Plaintiff has failed to produce evidence that the alleged retaliatory conduct rose to a level of an adverse action that implicates the FCA.

An adverse action is one that might have dissuaded a reasonable worker from engaging in the protected conduct.  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).  Even if the employer's actions do not give rise to a constructive discharge under state law, those same actions may constitute retaliatory actions under the FCA.  *See Moore v. California Inst. of Tech. Jet Propulsion Lab.*, 275 F.3d 838, 847 (9th Cir. 2002) (finding the employer's actions would not cause a reasonable person to feel compelled to quit, but might be actionable under the FCA). "[N]ormally petty slights, minor annoyances, and simple lack of good manners will not create such deterrence."  *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 68.  However, "[c]ontext matters," and "an act that would be immaterial in some situations is material in others."  *Id.* at 69 (internal citation and quotation marks omitted).

---

[4] Although the parties agree that the FCA requires retaliation that rises to the level of an "adverse employment action" as required in other federal statutory anti-retaliation provisions like Title VII and FMLA, they cite no binding precedent that so holds.  However, other circuits seem to use that standard, and I will apply it here.  *See, e.g., Moore v. California Inst. of Tech. Jet Propulsion Lab.*, 275 F.3d 838, 847–48 (9th Cir. 2002) ("behavior does not constitute retaliation under the False Claims Act unless it would be sufficient to constitute an adverse employment action under Title VII");  John T. Nicolaou, *Whistle While You Work: How the False Claims Act Amendments Protect Internal Whistleblowers*, 2011 COLUM. BUS. L. REV. 531, 542–43 (2011) ("Courts have interpreted the 1986 provision to have three elements: the plaintiff must demonstrate that (1) the plaintiff engaged in protected activity, (2) the defendant knew of the plaintiff's protected activity, and (3) the defendant took an adverse employment action against the plaintiff because of her engagement in protected activity") (citing *Hutchins v. Wilentz, Goldman & Spitzer*, 253 F.3d 176, 186 (3d Cir. 2001)).

Plaintiff lists the following actions as potential adverse action: the January 2012 warning letter regarding the phone call with Alexander; the February 2012 warning letter regarding Plaintiff's corporate credit card; the negative mid-year performance review; and the PIP.[5]  Pl.'s Mem. Opp. Mot. Summ. J. at 8–15.  Plaintiff also argues that even if none of those actions rises to the level of an adverse employment action on its own, the court may find that the employer's actions considered in the aggregate constitute retaliation.  Pl.'s Mem. Opp. Mot. Summ. J. at 16.

I find that none of these actions, on its own, rises to the level of an adverse employment action.  While a jury may find that any one of these actions was unfair or failed to adequately reflect Plaintiff's job performance, none of them would, in isolation, have dissuaded a reasonable worker from engaging in protected conduct.  *See Kant v. Seton Hall Univ.*, No. 03-6135, 2008 WL 65159 (D.N.J. Jan. 3, 2008) (supervisor memoranda not adverse actions because they were "simply letters of caution"); *Mickens v. Lower's Companies, Inc.,* No. 07–6148, 2009 WL 4911952, *9 (D.N.J. Dec.14, 2009) (negative employment evaluation not an adverse action) (collecting cases); *Strain v. Univ. of Pittsburgh Med. Ctr.*, No. 2:04-1660, 2007 WL 951490 (W.D. Pa. Mar. 27, 2007) (relieving plaintiff of certain duties, lateral transfer, and *warranted* negative performance evaluation not adverse actions); *Cashman v. CNA Fin. Corp.*, No. 08-5102, 2012 WL 113667, at *10 (E.D. Pa. Jan. 13, 2012) (refusal to allow a transfer, placement on PIP not adverse actions); *Cole v. Illinois*, 562 F.3d 812, 815 (7th Cir. 2009) (a PIP requiring the employee to work on "her tone" and "becom[e] a good listener" not an actionable adverse action).

However, viewing these actions in the aggregate, I find that Plaintiff has presented sufficient evidence, albeit barely, that may allow a jury to conclude that the cumulative effect of

---

[5] Plaintiff also cites her constructive discharge as an adverse employment action, but having found that the record fails to show a constructive discharge as a matter of law, I will not consider that as a potential adverse employment action.

16

these actions might have dissuaded a reasonable worker from engaging in protected conduct. "The cumulative impact of retaliatory acts may become actionable even though the actions would be de minimis if considered in isolation." *Brennan v. Norton*, 350 F.3d 399, 422 n.17 (3d Cir. 2003). For example, in *Moore v. City of Philadelphia*, 461 F.3d 331, 346 (3d Cir. 2006), *as amended* (Sept. 13, 2006) a pattern of "inappropriately severe discipline"—stripping the plaintiff of his weapon, changing his duties, ordering him to undergo a psychiatric evaluation, giving him a negative performance evaluation and a 30-day suspension, and transferring him to another district—was an overreaction that might dissuade a reasonable worker from reporting. The Court stated that an analysis of a retaliation claim must take into account "the 'totality of the circumstances,' as '[a] play cannot be understood on the basis of some of its scenes but only on its entire performance.' " *Id.* (internal citations omitted).

A reasonable jury could find that a reasonable employee would be dissuaded from reporting potential violations of the FCA if she knew that her supervisors would respond to such reports by becoming so hypercritical of her work performance that they began a pattern of issuing her warning letters, giving her negative performance reviews, and treating her in a condescending manner in front of her peers. While one warning letter that threatens (but does not take) disciplinary action and is simply placed in a personnel file may not dissuade a reasonable worker from engaging in protected conduct, the picture changes slightly when that letter is one of several negative reports. Such a paper trail created by human resources will likely affect an employee's potential to be considered for promotions and raises in the future, regardless of whether such a tangible action is taken against the employee immediately. Plaintiff's concerns about this potential are reflected in her written response to the January warning letter, in which she specifically requests that her performance be re-evaluated in six

months; she requested that if the re-evaluation were positive, that the positive evaluation be included in her file, or alternatively, that the warning letter be expunged from her file. Response to January Warning Letter, Pl. Ex. Z.

It may be that each of the disciplinary actions taken was justified by Plaintiff's job performance, and the relationship breakdown with her supervisors was solely the result of their frustration with her inability to meet the demands of the position. However, the complaints raised against Plaintiff in the January warning letter, the performance review, and the PIP were all subjective evaluations of her ability to effectively organize and lead her team. Because I cannot judge the credibility of either party on a motion for summary judgment, I find that there are genuine issues of material fact regarding the causal nexus between Plaintiff's complaints and Defendant's actions. Defendant's Motion must therefore be denied as it pertains to Plaintiff's FCA retaliation claim.

## V. Conclusion

For these reasons, Defendant's Motion for Summary Judgment will be granted as it pertains to the Wrongful Discharge claim, but denied as it pertains to the FCA claim. An appropriate Order follows.

/s/ Gerald Austin McHugh
United States District Court Judge